## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RENEE KENNEDY,** | |
| **Plaintiff,** | |
| v. | **Civil Action No.  05-238 (JDB)** |
| **DISTRICT OF COLUMBIA GOVERNMENT,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

Plaintiff Renee Kennedy, a Metropolitan Police Department employee, brings this action against the District of Columbia (the "District") alleging that it discriminated against her on the basis of her race during the course of her employment.  Specifically, plaintiff alleges that the District's failure to appoint her as the Acting Program Manager of the Directive Development Unit and its subsequent failure to promote her as the Permanent Program Manager of the Directive Development Unit violated 42 U.S.C. § 1981 (Counts I and III) and the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01 to 2-1411.06 (Counts II and IV).  Currently before the Court is the District's motion for summary judgment.  Upon careful consideration of the motion and the parties' memoranda, the applicable law, and the entire record, the Court grants the District's motion.

## BACKGROUND

Plaintiff Renee Kennedy, a black female, was appointed to the Metropolitan Police Department ("MPD") in 1992.  Statement of Undisp. Facts ("Statement") ¶ 1.  From October 1994

to January 2005, plaintiff held the position of Senior Technical Writer in the Directive

Development Unit ("DDU") of the Office of Organizational Development ("OOD").  Id. ¶ 3.  As a

Senior Technical Writer, Kennedy was supervised by Mary Ann Rogers ("Rogers"), who was the

Director of the Directive Development and Accreditation Division.  Id. ¶ 4.  Whenever Rogers

was out of the office, Kennedy claims she would stand in for Rogers, would attend meetings in

her place, and would perform some of her supervisory responsibilities.  Pl.'s Opp. at 2.

     In the fall of 2004, OOD was reorganized and several changes occurred.  Rogers' position

was abolished, and she was appointed as the Executive Manager of the Legal Training and

Review Unit at the Institute of Police Science ("IPS").  Statement ¶¶ 5-6.  Prior to her scheduled

transfer, Rogers asked MPD Chief Administrative Officer Nola Joyce ("Joyce") to permit

Kennedy to transfer with her to IPS.  Joyce approved Kennedy's transfer but was unable to provide

a specific date upon which the transfer would be effective.  Id. ¶ 4.  On October 8, 2004, Kennedy

sent a follow up e-mail to Joyce "formally requesting a release date from the Directive

Development, Accreditation and Risk Management Unit to be reassigned to the Training

Academy."  Def.'s Ex. B at 1.

     On October 18, 2004, Debra Hoffmaster ("Hoffmaster") was appointed to the position of

Senior Executive Director of the Policy and Program Development Division, and Hoffmaster

appointed Jo Hoots ("Hoots"), a white female, to the position of Acting Program Manager for

DDU.  Statement ¶¶ 13-14.  Plaintiff believes that she should have been next in line for this

promotion based upon her knowledge and her years of experience in DDU writing directives.  Pl.'s

Opp. at 2.  After Hoots was appointed, Kennedy continued to make several inquires requesting a

release date from DDU to IPS.  In response to her inquiries, Kennedy was instructed to develop a

transition plan that would minimize the impact of her departure and would resolve her outstanding work obligations.  Statement ¶ 12.

Around this time, Hoffmaster asked Kennedy to stay in DDU.  Hoffmaster told Kennedy that they would create a position for her as an editor, which would involve supervising lieutenants. Id. ¶¶ 16-17; Def.'s Ex. A at 13:16-22.  Kennedy declined the offer to stay in DDU, told Hoffmaster that she could not work under Hoots, and indicated that there was no potential for a promotion in DDU.  Statement ¶ 18.  Kennedy wanted to transfer to IPS to "have more potential to grow, to develop, [and] to be in charge of programs."  Def.'s Ex. A at 14:17-20.  Therefore, Kennedy continued to work on the transition plan.  After the transition plan was completed, Hoffmaster and Hoots agreed to release Kennedy to IPS on November 1, 2004.  Statement ¶ 21. As she was instructed, Kennedy prepared a formal memo requesting a transfer to IPS and began packing up her office.  On October 29, 2004, however, Kennedy was informed that she could not transfer to IPS until a position in IPS became vacant and available.  Id. ¶ 29.

Kennedy was later told that she would remain assigned to DDU in the meantime and that Hoots would be her supervisor.  Id. ¶¶ 30-31.  Kennedy objected to Hoots' supervision since they were both the same pay grade, and Kennedy raised this concern with Hoffmaster.  Id. ¶ 36.  In response, Hoffmaster formally instructed Kennedy that Hoots and another DDU employee, Lieutenant Patricia Shahid ("Shahid"), would in fact be her supervisors.  When Hoffmaster added Shahid as a supervisor, Kennedy also objected because she had previously trained Shahid in DDU and because she believed that Shahid was the same grade that she and Hoots were -- Grade 13.  Id. ¶¶ 37-39.  Kennedy asked Deputy Chief Administrative Officer Sampson Annan ("Annan") if there was a policy governing such a line of supervision, and he indicated that he would get back to

her with an answer.  Kennedy claims that she called the personnel office that same day and was
told that a Grade 13 could not supervise another Grade 13 even though there was no such policy in
writing.  Pl.'s Ex. A at 30:19-31:12.  Around that time, Shahid and Hoots asked Kennedy to meet
with them, and Kennedy responded that she was waiting for a formal answer from Annan to
confirm if either of them could act as her supervisors without violating D.C. or MPD policies.
Statement ¶¶ 40-41.  Shortly thereafter, Kennedy received a verbal warning of insubordination for
failing to meet with her supervisors, Hoots and Shahid.  Id. ¶ 42.

In December 2004, Kennedy received an e-mail explaining that office changes were going
to occur in DDU.  Id. ¶ 47.  Kennedy claims that her office was going to be relocated "from where
it was to where the officers that she had trained were."  Pl.'s Opp. at 8.  Kennedy sent an e-mail to
Hoffmaster, Annan, and Joyce requesting a meeting about the relocation, and the office move was
postponed.  Statement ¶ 54.  Later in December, for the week of December 27, 2004, Kennedy
was made the Acting Program Manager while Hoots was out of the office.  Pl.'s Opp. at 8.

Kennedy appealed her insubordination charge to Annan, and Annan responded on January
4, 2005, saying that the Permanent Program Manager position had been established and that
Hoots, as the Acting Program Manager, could supervise Kennedy while she held that position.
Statement ¶ 56.  In response to Annan's e-mail, Kennedy argued that if Hoots' position was just
established, Hoots should have lacked the authority to supervise Kennedy for the past two months.
Kennedy also expressed concern about not seeing a job announcement for the Permanent Program
Manager position and argued that since Hoots had been acting in a position that had not been
established up until that point, the fact that Kennedy was told that she could not be moved to IPS
because there was no position was "null and void."  Id. ¶ 57.  Annan told Kennedy that the Chief

of Police could detail people to positions to accomplish the goals of the Department and that there was nothing unusual about Hoots acting in a position that was being established.  Id. ¶ 58.

On January 11, 2005, Kennedy's request to transfer to IPS was approved with a transfer date of January 23, 2005.  Kennedy transferred on the assigned date and began working under Rogers once again.  Id. ¶¶ 61-64.  One day later, on January 24, 2005, Kennedy sent a letter to the Mayor, the Metropolitan Police Department, and the Office of the Attorney General claiming that the District had violated her rights when she was not made the Acting Program Manager of DDU. Id. ¶ 66.  Kennedy subsequently filed this action against the District on February 1, 2005.  In her initial complaint, Kennedy claimed that the District's failure to promote her to the Acting Program Manager position constituted racial discrimination in violation of 42 U.S.C. § 1981 and the District of Columbia Human Rights Act ("DCHRA").  Compl. ¶¶ 41-52.

Later in February 2005, the MPD issued the vacancy announcement for the Permanent Program Manager position that Hoots had occupied in an acting capacity since October 2004. Only Kennedy and Hoots applied for the permanent position.  Statement ¶¶ 69-73.  After the Staffing Specialist received the applications, he determined that both applicants were qualified and forwarded both applications to Hoffmaster, the selecting official.  Id. ¶¶ 74-76.  Hoffmaster then conducted a paper review of the applications and resumes, and Hoffmaster selected Hoots for the Permanent Program Manager position on March 3, 2005.  Id. ¶¶ 77-78.  Kennedy was advised that she had not been selected for the position, and on May 2, 2005, Kennedy filed an amended complaint in this Court to include claims arising out of the District's failure to promote her to the Permanent Program Manager position.  See Am. Compl. ¶¶ 57-68.

The District has moved for summary judgment on all counts of plaintiff's amended

complaint.  The District argues that plaintiff's DCHRA claim regarding the Permanent Program

Manager position is barred by the mandatory notice provision of D.C. Code § 12-309, that

plaintiff cannot bring a claim under 42 U.S.C. § 1981 because she lacks an employment contract,

that, in any event, plaintiff cannot establish a prima facie case of racial discrimination, and that the

District had legitimate nondiscriminatory reasons for failing to promote Kennedy to either

position.  The Court agrees that summary judgment is warranted for the District on all counts of

plaintiff's amended complaint.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that

"there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion

by "informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude

summary judgment, the court must regard the non-movant's statements as true and accept all

evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere

existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the

absence of evidence proffered by the non-moving party, a moving party may succeed on summary

judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury

could reasonably find for the [non-movant]." Id. at 252.

## DISCUSSION

**I.     Mandatory Notice Provision of D.C. Code § 12-309**

The District argues that Kennedy's DCHRA claim regarding the Permanent Program

Manager position is barred for failure to comply with the mandatory notice provision of D.C.

Code § 12-309.[1]  That statute provides:

> An action may not be maintained against the District of Columbia for unliquidated
> damages to person or property unless, within six months after the injury or damage was
> sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of
> the District of Columbia of the approximate time, place, cause, and circumstances of the
> injury or damage.

D.C. Code § 12-309.  Although there appears to be no D.C. Court of Appeals case explicitly

holding that § 12-309 applies to claims under the DCHRA, the application of § 12-309 to other

D.C. statutes suggests that § 12-309 is applicable in this situation. See, e.g., Doe by Fein v.

District of Columbia, 697 A.2d 23, 28 (D.C. App. 1997) (holding that plaintiff's claims based

upon the District of Columbia Prevention of Child Abuse and Neglect Act, D.C. Code §§ 6-2101

et seq. (1995), which does not reference § 12-309, were barred for failure to comply with the § 12-

---

[1]The District does not argue that plaintiff's 42 U.S.C. § 1981 claim regarding the
Permanent Program Manager position is similarly barred because the D.C. Circuit has previously
held that "noncompliance with 12 D.C. Code § 309 cannot bar [a plaintiff's] federal claims."
Brown v. United States, 742 F.2d 1498, 1509-10 (D.C. Cir. 1984).

309 notice requirement).

Moreover, the plain language of § 12-309 supports such a conclusion.  Section 12-309 clearly states that "[a]n action may not be maintained against the District of Columbia" unless the advance written notice requirement is complied with.  Because one of the chief purposes of § 12-309 is to provide timely notice of "unliquidated damages" claims against the District and because such damages are authorized under the DCHRA, it is appropriate to subject DCHRA claims to the demands of § 12-309.  See, e.g., McFarlane v. New Leaders for New Schools, No. 2004 CA 008506, at 14 (D.C. Super. Ct. Nov. 10, 2005) (granting summary judgment for the defendant on the plaintiff's DCHRA claim based upon the plaintiff's failure to comply with § 12-309); Descutner v. District of Columbia, No. 2004 CA 007214, at 5 (D.C. Super. Ct. Mar. 1, 2005) (granting the defendant's motion to dismiss the plaintiff's DCHRA claim for failure to comply with § 12-309).  Kennedy does not contest that compliance with § 12-309 is a prerequisite to bringing a claim under the DCHRA and in fact concedes this point in her opposition.  See Pl.'s Opp. at 19.  Instead, Kennedy simply asserts that her January 24, 2005 letter and her subsequent lawsuit constitute sufficient notice of her claim regarding the Permanent Program Manager position.

District of Columbia "case law has firmly established that, because it is in derogation of the common law principle of sovereign immunity, section 12-309 is to be construed narrowly against claimants."  District of Columbia v. Dunmore, 662 A.2d 1356, 1359 (D.C. 1995).  The rationale underlying the notice requirement is to allow the District of Columbia to investigate and resolve claims with merit before litigation expenses arise.  Id.  Once an individual has sent written notice to the Mayor of the District of Columbia, the content of the written notice is interpreted

liberally, but the "circumstances must be described with enough specificity to allow 'the District to conduct a prompt, properly focused investigation of the claim.'"  Allen v. District of Columbia, 533 A.2d 1259, 1262 (D.C. 1987) (quoting Washington v. District of Columbia, 429 A.2d 1362, 1366 (D.C. 1981)); see Chidel v. Hubbard, 840 A.2d 689, 696 (D.C. 2004) (holding that notice was insufficient to permit a negligence claim against the District where the notice "made absolutely no mention of the District's negligent operation of the Southwest Clinic").  Failure of the formal written notice "to meet the required specificity would bar the suit even if the notice actually prompted the city to make an investigation."  Campbell v. District of Columbia, 568 A.2d 1076, 1079 (D.C. 1990) (citing Washington, 429 A.2d at 1367).

To satisfy the requirements of § 12-309, an individual's written notice must "disclose both the factual cause of the injury and a reasonable basis for anticipating legal action as a consequence."  Powell v. District of Columbia, 645 F. Supp. 66, 69 (D.D.C. 1986) (quoting Washington, 429 A.2d at 1366).  Upon review of Kennedy's January 24, 2005 letter, it is clear that the letter does not satisfy either of these requirements in regard to Kennedy's DCHRA claim relating to the Permanent Program Manager position.  Kennedy's written notice alleges that the District engaged in racial discrimination when it named "a white female writer/editor Grade DS-13 with OOD, as acting Program Manager for Directive Development."  Pl.'s Ex. E at 2 (emphasis added).  The letter dated January 24, 2005, only referred to the Acting Program Manager position because Kennedy was not in fact denied the promotion to the Permanent Program Manager position until March 2005.  Kennedy did not, and could not, explain the factual cause of her injury relating to the denial of the Permanent Program Manager position because she had not experienced that alleged injury at the time her letter was sent.

Hence, upon receipt of Kennedy's letter in January, the District certainly was not put on notice of a claim that did not yet exist; moreover, the District could not have reasonably anticipated legal action relating to the Permanent Program Manager position.  Just because one claims discrimination in the denial of an acting position does not necessarily mean that a claim will be pursued for a subsequent independent denial of a permanent position.  Accordingly, the Court holds that Kennedy's January 24, 2005 letter did not satisfy the requirements of § 12-309 for her DCHRA claim relating to the Permanent Program Manager position.

Notwithstanding Kennedy's argument that her subsequent lawsuit constituted sufficient notice of her claim regarding the Permanent Program Manager position, it is well-established that "a complaint does not itself satisfy the notice requirements of Section 12-309." Powell, 645 F. Supp. at 69; see Campbell, 568 A.2d at 1079.  "Section 12-309 makes clear that police reports are the only acceptable alternatives to a formal notice.  The court is not free to go beyond the express language of the statute and authorize any additional documents to meet its requirements." Doe, 697 A.2d at 28.  If a litigant could properly serve notice on the Mayor, commence litigation, and then add any additional claims that arose out of a different factual setting in an amended complaint, the purpose of § 12-309 would be severely undermined.  The Court therefore refuses to adopt the position asserted by Kennedy.

The Court holds that Kennedy did not satisfy the mandatory notice provision of § 12-309 with respect to her DCHRA claim regarding the Permanent Program Manager position and accordingly grants the District's motion for summary judgment on Count IV of Kennedy's amended complaint.

## II.   Contract Requirement Under 42 U.S.C. § 1981

Plaintiff has brought two claims of racial discrimination under 42 U.S.C. § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts."  42 U.S.C. § 1981(a).  The statute currently defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  § 1981(b).

Citing the Supreme Court's recent opinion in Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 (2006), the District argues that Kennedy may not bring a claim for racial discrimination under § 1981 because she has not suffered an impaired contractual relationship.  In Domino's, the plaintiff was the sole shareholder and president of a corporation that entered into a series of contracts with Domino's Pizza, Inc.  Id. at 472.  When Domino's refused to perform under the contracts, allegedly due to its racial animus toward the African-American plaintiff, the plaintiff brought suit under § 1981.  In rejecting the plaintiff's argument that he had a cause of action under § 1981, the Supreme Court clarified that "a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'"  Id. at 479-80 (quoting 42 U.S.C. § 1981(a)).  But unlike the plaintiff in Domino's, who was not a party or a third-party beneficiary to the contracts that were the basis of his § 1981 claim, Kennedy is asserting a § 1981 racial discrimination claim directly on her own behalf.

The District contends, however, that Kennedy does not have an impaired contractual relationship because Kennedy serves by public appointment with the Metropolitan Police Department.  See D.C. Code § 5-105 ("The Mayor of said District shall appoint to office, assign to

such duty or duties as he may prescribe, and promote all officers and members of said
Metropolitan Police force . . . ."). The District argues that Kennedy's employment is instead
governed by a comprehensive set of statutes and regulations. To support its position the District
cites Kizas v. Webster, 707 F.2d 524, 535 (D.C. Cir. 1983), which held that clerical and support
employees of the Federal Bureau of Investigation did not have a vested contractual right to a
special preference program as a form of compensation. In reaching that decision, the D.C. Circuit
explained that the federal workers' "entitlement to pay and other benefits 'must be determined by
reference to the statutes and regulations governing [compensation], rather than to ordinary
contract principles.'" Id. (quoting United States v. Larionoff, 431 U.S. 864, 869 (1977)).
Although Kennedy is an appointed official whose terms and conditions of employment may be
similarly determined by statutes and regulations, Kizas is not on point for a determination of
whether Kennedy, as a public employee, has a sufficient contractual relationship to proceed with
her § 1981 claim because it did not involve that issue (or a § 1981 claim at all).

  In addressing a similar question of whether public employment in California precluded a
§ 1981 claim, the Ninth Circuit analyzed whether state or federal law determined if the
employment relationship was contractual. See Ramirez v. Kroonen, 44 Fed. Appx. 212, 217 (9th
Cir. 2002). With no guidance from the language of § 1981, the court proceeded to use the
Supreme Court's three-step analysis based upon 42 U.S.C. § 1988:

> First, courts are to look to the laws of the United States 'so far as such laws are suitable to
> carry [the civil and criminal civil rights statutes] into effect.' If no suitable federal rule
> exists, courts undertake the second step by considering application of state 'common law,
> as modified and changed by the constitution and statutes' of the forum State. A third step
> asserts the predominance of the federal interest: courts are to apply state law only if it is
> not 'inconsistent with the Constitution and laws of the United States.'

Id. (quoting Burnett v. Grattan, 468 U.S. 42, 47-48 (1984)).

Because federal civil rights statutes did not provide an answer, the Ramirez court looked to California law, which provided that "public employment is not held by contract but by statute." Id. at 218 (quoting Miller v. State of Cal., 557 P.2d 970, 973 (Cal. 1977)).  Under the third step of the analysis, however, the court determined that California law was inconsistent with the Constitution and laws of the United States: "The Civil Rights Act of 1866 implemented the Thirteenth Amendment, which was enacted with an intent to remedy 'the most self-evident deprivation of slavery, the right to contract freely for one's labor.'" Id. at 218 (quoting 2 Joseph G. Cook & John L. Sobieski, Jr., Civil Rights Actions ¶ 5.13 (Lexis-Nexis 1983 & Supps.)).  Noting that the Supreme Court has presumed that § 1981 prohibits discrimination by public entities while holding that it also bars private party discrimination, the court in Ramirez held that the publicly employed plaintiff had a sufficient contractual relationship to bring his denial of promotion claim under § 1981.  Id. at 219; see Peterson v. State of Cal. Dep't of Corr. & Rehab., 451 F. Supp. 2d 1092, 1104 (E.D. Cal. 2006) (holding that "[p]laintiff's statutorily held employment should not bar his ability to bring section 1981 claims").

This Court agrees that even if District of Columbia law provides that Kennedy's public employment is generally held by statute instead of by contract, the federal interest for § 1981 claims predominates in this situation since "[t]he right to dispose of one's labor freely by contract is at the heart of the protections afforded by § 1981." Sagana v. Tenorio, 384 F.3d 731, 737 (9th Cir. 2004) (citing Jones v. Alfred H. Mayer Co., 392 U.S. 409, 441 n.78 (1968)).  "None can contest that discriminating against an employee on the basis of race is illegal and against public policy.  In amending § 1981, Congress was advancing such public policy concerns by providing a

vehicle for every employee to remedy racial discrimination in the workplace." Lauture v. Int'l Bus. Machs. Corp., 216 F.3d 258, 263 (2d Cir. 2000).

In this light, Kennedy's employment encompasses the basic elements of a contractual relationship -- offer, acceptance, and consideration -- needed for a § 1981 claim. See, e.g., Lauture, 216 F.3d at 261 (allowing an at-will employee to bring a § 1981 claim because the plaintiff's "promise to perform work for [the defendant], as consideration for [the defendant's] promise to pay her, was a contract"); Adams v. McDougal, 695 F.2d 104, 108 (5th Cir. 1982) (holding that an appointed deputy sheriff's employment relationship "was sufficient to bring [his claim] under the protective umbrella of § 1981 since the "sheriff promised to pay his deputies a stated salary" and "the deputies promised to perform their jobs" in return). Accordingly, the Court denies the District's request for summary judgment on this ground and holds that Kennedy's public employment does not preclude her from asserting a § 1981 claim. To hold otherwise would exempt the D.C. government from § 1981 liability for unlawful employment discrimination altogether, a conclusion this Court is not prepared to reach.

### III.    Plaintiff's Claims Under 42 U.S.C. § 1981 and the DCHRA

Claims under 42 U.S.C. § 1981 and the DCHRA are analyzed using "the Supreme Court's approach in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the seminal case establishing the burden of proof in employment discrimination cases under Title VII." Miller v. Am. Coal. of Citizens with Disabilities, Inc., 485 A.2d 186, 189 (D.C. 1984) (applying the McDonnell Douglas framework to the DCHRA); see Morgan v. Fed. Home Loan Mortgage Corp., 328 F.3d 647, 650 (D.C. Cir. 2003) (citing Carter v. Duncan-Huggins, Ltd., 727 F.2d 1225, 1232 (D.C. Cir. 1984)) (applying the McDonnell Douglas framework to § 1981

claims).  Under this familiar framework, the plaintiff first has the burden of proving by a

preponderance of the evidence a prima facie case of discrimination.  <u>McDonnell Douglas</u>, 411

U.S. at 802; <u>see</u> <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981).  If the

plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to

articulate some legitimate, nondiscriminatory reason for the employee's rejection."  <u>McDonnell

Douglas</u>, 411 U.S. at 802.  Then, assuming the employer articulates a legitimate reason for its

actions, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence

that the employer's stated reason was a pretext for discrimination.  <u>Reeves v. Sanderson Plumbing

Prods., Inc.</u>, 530 U.S. 133, 143 (2000).  The Court will address each element of this framework in

turn.

　　　　"The burden of establishing a prima facie case of disparate treatment is not onerous."

<u>Burdine</u>, 450 U.S. at 253.  To meet her burden, the plaintiff must prove by a preponderance of the

evidence that "(1) she is a member of a protected class; (2) she suffered an adverse employment

action; and (3) the unfavorable action gives rise to an inference of discrimination."  <u>Stella v.

Mineta</u>, 284 F.3d 135, 145 (D.C. Cir.  2002).[2]  As a black female, the plaintiff is a member of a

protected class, so she has satisfied the first element of the analysis.  The plaintiff has also

demonstrated that she suffered an adverse employment action when she was not selected to be the

---

[2]Put slightly differently, in the hiring or promotion context a plaintiff must show that: "(1)
he is a member of a protected class; (2) he applied for and was qualified for an available position;
(3) despite his qualifications he was rejected; and (4) either someone . . . filled the position or the
position remained vacant and the employer continued to seek applicants."  <u>Lathram v. Snow</u>, 336
F.3d 1085, 1088 (D.C. Cir. 2003) (citation omitted).

-15-

Acting Program Manager or the Permanent Program Manager.[3]  Although the Acting Program

Manager position was only a temporary appointment, the District itself concedes that both the

Acting and Permanent Program Manager positions constituted promotions.  Def.'s Mem. at 22-23

(stating that "the District promoted the person that it believed was the most qualified for the

Acting Program Manager and Program Manager positions").  And "[t]here is no question that

failure to promote is an 'adverse action' for purposes of the prima facie case."  Stella, 284 F.3d at

146 (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)); see Brown v. Brody, 199

F.3d 446, 456 (D.C. Cir. 1999) (stating that "[a] tangible employment action constitutes a

significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing a significant change in

benefits").

        To demonstrate that the District's failure to promote Kennedy to either position leads to an

inference of discrimination, Kennedy may show that her "rejection is not attributable to 'the two

most common legitimate reasons on which an employer might rely to reject a job applicant: an

absolute or relative lack of qualifications or the absence of a vacancy in the job sought.'"  Stella,

284 F.3d at 145 (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 n.44 (1977)).

The Acting Program Manager position became available in October 2004, and the vacancy

announcement for the Permanent Program Manager position was issued in February 2005.  The

District has also conceded that Kennedy was "qualified to fill the acting and permanent Program

Manager positions."  Def.'s Mem. at 22.  Thus, Kennedy has satisfied her burden of establishing a

---

        [3]While the selection for Acting Program Manager must be assessed under both § 1981 and
the DCHRA, the selection for Permanent Program Manager need only be analyzed under § 1981
in light of plaintiff's failure to comply with D.C. Code § 12-309 on her DCHRA claim.

prima facie case of discrimination.

The burden therefore shifts to the District to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for failing to promote Kennedy to either position.  Since the District merely has the burden of production, the District "need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Burdine, 450 U.S. at 254.

Here, the District claims it followed legitimate procedures under D.C. Personnel Regulations to promote Hoots temporarily as Acting Program Manager, which occurred after Kennedy requested a transfer to IPS.  According to the D.C. personnel regulation cited, "[a] Career or Excepted Service employee may be temporarily promoted to a Management Supervisory Service position for which he or she qualifies."  D.C. Pers. Regs., Ch. 18, Pt. I § 3813.5A. Kennedy does not dispute the District's contention that it was permitted to promote Hoots under this regulation and that it did so in conformity with the regulation.

The District also argues that it selected Hoots over Kennedy for both the Acting and Permanent positions because Hoots had more "supervisory experience," had "managed other people in the Army reserves," and submitted a more complete application demonstrating her qualifications for the position.  Def.'s Mem. at 23.  In support, the District attaches Hoots' resume and application, Kennedy's resume and application, and the selection certificate with an interoffice memorandum.  Def.'s Exs. Z-DD.  In the interoffice memorandum dated March 3, 2005, Hoffmaster explains the outcome of the paper review for the permanent position and states:

It is clear from my review of this documentation that Ms. Jo Hoots is the best-qualified

-17-

candidate for the position of Program Manager for Directives Development (MSS-340-14). She addressed each ranking factor with specific examples to illustrate her experience, skill and practical application of the required knowledge. The specific examples were of sufficient depth and scope to support a demonstrated ability to perform the responsibilities of the position.

Def.'s Ex. DD.

Because the District's proffers satisfy its burden under the McDonnell Douglas framework, the burden shifts back to Kennedy to demonstrate that the District's proffered nondiscriminatory explanations are a pretext for discrimination. See Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1182 (D.C. Cir. 1996) (finding the defendant's statement that "it chose between [two applicants] based solely upon their answers during the interview" sufficient to move on to the third step of the McDonnell Douglas analysis). A plaintiff asserting that an employer's explanation is pretextual based on comparative qualifications faces a formidable task. "[I]n order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination." Jackson v. Gonzales, 496 F.3d 703, 707 (D.C. Cir. 2007) (quoting Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006)). "Even if a court suspects that a job applicant 'was victimized by [ ] poor selection procedures' it may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" Fischbach, 86 F.3d at 1183 (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)). "Short of finding that the employer's stated reason was indeed a pretext, however -- and here one must beware of using 20/20 hindsight -- the court must respect the employer's unfettered discretion to choose among qualified candidates." Id. (citing Ramey v. Bowsher, 915 F.2d 731, 735 (D.C. Cir. 1990)).

Here, based upon the evidence before the Court, there is no qualifications gap between Kennedy and Hoots which is indicative of racial discrimination. Both Hoots and Kennedy held

advanced degrees, were certified public managers, had relevant experience for each position, and worked in the MPD office where there was a vacancy.  There is, moreover, no basis in the record upon which to question Hoffmaster's assessment of the relative qualifications of Hoots and Kennedy.  "When an employer says it made a hiring decision based on the relative qualifications of the candidates, 'we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone.'"  Jackson, 496 F.3d at 707 (quoting Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc)).

The D.C. Circuit strongly confirmed earlier this year in Jackson that courts should not second-guess or reexamine governmental promotion decisions involving close choices between qualified candidates.  To do otherwise might "render the judiciary a 'super-personnel department that reexamines an entity's business decisions' -- a role we have repeatedly disclaimed."  Id. at 707 (quoting Holcomb, 433 F.3d at 897); see also Stewart v. Ashcroft, 352 F.3d 422, 430 (D.C. Cir. 2003).  To paraphrase the court in Jackson, like the plaintiffs in both Stewart and Jackson, Kennedy "was simply not discernibly better" than Hoots.  Jackson, 496 F.3d at 708.

To survive summary judgment at this point "the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason."  Prince v. Rice, 453 F. Supp. 2d 14, 23 (D.D.C. 2006) (quoting Lathram, 336 F.3d at 1088).  The Court may consider "the strength of the prima facie case, any direct evidence of discrimination, any circumstantial evidence that defendant's proffered explanation is false . . . , and any properly-considered evidence supporting the employer's case."  Id.  The plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing

that the employer's proffered explanation is unworthy of credence.'" <u>Reeves</u>, 530 U.S. at 143

(quoting <u>Burdine</u>, 450 U.S. at 256).  But "[p]roof that the defendant's explanation is unworthy of

credence is simply one form of circumstantial evidence that is probative of intentional

discrimination."  <u>Id.</u> at 147.

Kennedy argues that she can demonstrate pretext by showing that similarly situated

employees not within the same protected class were not subjected to the same treatment as she

was.  When Kennedy attempted to transfer to IPS, she was told that Executive Assistant Chief

Michael Fitzgerald would not permit the transfer on November 1, 2004, because he required that a

vacant position first exist in IPS.  Once so informed, Kennedy contacted Annan to point out that

Hoots was acting in a position that had not been established.  In response, Annan indicated that

was "nothing new" and that it "happens all the time."  Pl.'s Ex. D at 1.  Kennedy, however, claims

that a disparity exists between Caucasians and African-Americans in this regard.  According to

Kennedy, "Caucasian females, including Ms. Hoots and Ms. Hoffmaster, have been placed in non-

existent positions, while African-American females with similar experience and education are not

placed in such positions."  Pl.'s Opp. at 23; Pl.'s Ex. A at 16:12-20.  To support her assertion,

plaintiff cites to an e-mail from Annan and claims that he "admitted that Ms. Hoots was serving in

a position that had not been created."  Pl.'s Opp. at 23-24.  Based on that assertion, Kennedy

argues that the denial of her transfer was motivated by racial discrimination.  Plaintiff neglects to

mention, however, that in the e-mail from Annan he also indicates that three African-Americans

(himself and two females, Anne Grant and Rogers) were also acting in positions that were being

established.  Pl.'s Ex. D at 1.

The District disputes Kennedy's contention, claims that Kennedy is not similarly situated

to the comparators she lists, and argues that African-Americans, including Kennedy, "were placed into positions that were not completely established prior to their transfer to their respective positions." Def.'s Reply at 8.  The District proffers (without rebuttal by Kennedy) several names to argue that no racial discrimination exists in transferring employees, but Kennedy's own experience itself severely undercuts her argument of pretext.  Kennedy acknowledges that while Hoots was out of the office for a week in December 2004, Kennedy was made the Acting Program Manager.  For that week, then, Kennedy occupied a position that had not yet been established. Even more detrimental to Kennedy's argument is the fact that she was allowed to transfer to IPS in January 2005.  When she transferred to IPS, she acknowledges that she did not have an official title because the position had not been established in IPS.  Def.'s Ex. A at 41:20-42:8; 51:7-14. The position was formally established six months after she transferred, at which point she was formally appointed as the Deputy Director of the Legal and Training Review Unit.  Id. at 41:9-16. Plainly, then, Kennedy -- like several other Caucasian and African-American employees alike -- was permitted to transfer into positions not yet completely established.  For these reasons, the Court finds Kennedy's pretext argument unpersuasive.

Kennedy also argues that the District's articulated reasons were pretextual because, unlike Kennedy, "[t]here were not any Caucasian employees that were subjected to supervision by subordinates or peers." Pl.'s Opp. at 24.  Kennedy claims that she was to report to Shahid and Hoots as her direct supervisors even though Kennedy had previously trained Shahid in DDU and even though all three individuals were Grade 13.  To support the proposition that this action violated an office policy, Kennedy asserts that someone in the personnel office told her that Grade 13s could not supervise each other even though there was no such policy in writing.  But even if

such an informal policy did exist, "[a]n employer's failure 'to follow its own regulations and

procedures, alone, may not be sufficient to support' the conclusion that its explanation for the

challenged employment action is pretextual." Fischbach, 86 F.3d at 1183 (citing Johnson v.

Lehman, 679 F.2d 918, 922 (D.C. Cir. 1982)).

     According to the memorandum on Kennedy's verbal warning of insubordination, the

Executive Director, Hoffmaster, instructed Kennedy that she "was required to respond

appropriately to the chain of command as [Hoffmaster] had outlined." Def.'s Ex. Q. at 2.  In

January 2005, Kennedy also received an e-mail from Shannon Cockett which indicated that the

Program Manager position had been established and that Hoots could act as Kennedy's supervisor

when she occupied that position in an acting capacity.  Def.'s Ex. S at 1.

     Moreover, Kennedy's own experience once again undercuts her argument of pretext.

When Kennedy was made the Acting Program Manager in Hoots' absence for a week in December

2004, she assumed the responsibilities of the Acting Program Manager.  Kennedy concedes that

while she occupied the position she had the power to supervise everyone else in the department,

including a lieutenant.  Pl.'s Ex. A at 74:7-75:6.  Since Kennedy asserts that "according to the

police department a lieutenant is a Grade 13," Pl.'s Ex. A at 30:7-8, Kennedy herself acted as a

supervisor over someone of her same grade.[4]

--------

    [4]In Kennedy's opposition, she also argues that the office reorganization reflects racial
discrimination because plaintiff's office was to be moved "from where it was to where the officers
that she had trained were." Pl.'s Opp. at 24.  Kennedy's argument regarding the office
reorganization is too speculative to create a genuine issue of material fact regarding the District's
motivations for failing to promote her to be the Acting or Permanent Program Manager.  In
addition, the office adjustment was delayed based upon Kennedy's objection to moving.  Her
office was not moved until January 15, 2005, after her transfer to IPS had been approved.  Thus,
Kennedy was only in the new office for one week before she transferred to IPS.  Statement ¶ 63.

Based on an examination of the existing record and considering all of the relevant factors discussed above, the Court concludes that a reasonable jury could not find that the District's explanations for failing to promote Kennedy to either the Acting or Permanent Program Manager position were a pretext for racial discrimination, and hence, Kennedy has not shown that a reasonable jury could conclude she was not promoted for a discriminatory reason.  See Jackson, 496 F.3d at 707; Murray v. Gilmore, 406 F.3d 708, 713 (D.C. Cir. 2005); Waterhouse v. District of Columbia, 298 F.3d 989, 992 (D.C. Cir. 2002).  Accordingly, the District's motion for summary judgment will be granted.[5]

## CONCLUSION

For the reasons stated above, the District's motion for summary judgment is granted.  A separate order accompanies this memorandum opinion.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated:    October 23, 2007

---

[5]In Kennedy's opposition to the District's motion for summary judgment, Kennedy asserts a retaliation claim for the first time.  At this stage in the litigation, however, Kennedy may not amend her complaint through her responsive pleadings.  E.g., Calvetti v. Antcliff, 346 F. Supp. 2d 92, 107 (D.D.C. 2004) (stating that plaintiffs' attempt to amend their complaint through their pleadings was "clearly impermissible"); Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv., 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting Coleman v. Pension Benefit Guar. Corp., 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000)).  Therefore, the Court will not consider Kennedy's belated claim of retaliation.